1

1                   UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF NEW YORK

3

4

5   - - - - - - - - - - - - - -X
    UNITED STATES OF AMERICA              16-CR-6063(G)
6
    vs.
7                                         Rochester, New York
    TONY IVEY,                            March 7, 2017
8             Defendant.                  3:43 p.m.
    - - - - - - - - - - - - - -X
9

10

11                   TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE FRANK P. GERACI, JR.
                UNITED STATES DISTRICT CHIEF JUDGE
12

13

14                   RICHARD S. HARTUNIAN  ESQ.
                     United States Attorney
15                   BY: GEOFFREY J.L. BROWN, ESQ.
                     Assistant United States Attorney
16                   100 South Clinton Street
                     Syracuse, New York 13261
17

18
                     MARIANNE MARIANO, ESQ.
19                   Federal Public Defender
                     BY: ROBERT G. SMITH, ESQ.
20                   Assistant Federal Public Defender
                     28 East Main Street, Suite 400
21                   Rochester, New York 14614
                     Appearing on behalf of the Defendant
22
    ALSO PRESENT:     David Spogen, U.S. Probation Office
23

24  COURT REPORTER:   Christi A. Macri, FAPR-CRR
                      Kenneth B. Keating Federal Building
25                    100 State Street, Room 2120
                      Rochester, New York 14614

2

**P R O C E E D I N G S**

\*          \*          \*

(**WHEREUPON**, the defendant is present).

**THE COURT:** Good afternoon.

03:43:09PM **MR. SMITH:** Good afternoon, Your Honor.

**MR. BROWN:** Good afternoon, Your Honor.

**THE COURT:** Are you Tony Ivey?

**THE DEFENDANT:** Yes, sir.

**THE COURT:**  You appear with your attorney

03:43:15PM Mr. Smith?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** This matter's on for sentencing.  The

Court does have the presentence report.  I also have a

statement from the Government, a statement from the defendant.

03:43:30PM The defense does make an argument that there should

be a four point reduction under guideline 2A6.1(b)(6).  The

Government opposes that, indicates that that's not applicable.

Do you want to be heard on that?

**MR. SMITH:** Yes, Your Honor, I do.  It's all

03:43:50PM according to the Court of Appeals in *United States vs. Wright*

case.  It all depends what you're looking at for the word

"deliberation."

The word deliberation, according to the report,

means just the statement that was made by Mr. Ivey; and there

03:44:05PM were two statements made, which is okay, you can make two

1  statements and all that happened was Mr. Ivey made a statement

2  that was a threat, and that was all that happened.

3          All the other things that happened through the

4  U.S. Attorney's Office were really not for Mr. Ivey.  So

03:44:23PM 5  Mr. Ivey made that little statement and there was no --

6              THE COURT:  I wouldn't call it a "little statement."

7              MR. SMITH:  Made the little threat.

8              THE COURT:  Little threat?

9              MR. SMITH:  That's all it was, was a little threat.

03:44:33PM10              THE COURT:  Little threat to come to this building

11  with an automatic weapon.

12              MR. SMITH:  That's right.

13              THE COURT:  I wouldn't characterize it as a "little

14  threat."

03:44:39PM15              MR. SMITH:  He made a threat to come to this

16  building.  And when they went out to see him about this

17  threat, there was no automatic weapon there, there was no

18  single shot weapon there, there was no weapon at all.

19          And while it's not all that important how far they

03:44:57PM20  went, they had to go to Cheektowaga, which is some 45 miles

21  from Rochester.  So it looks like they had to go a distance to

22  get to Mr. Ivey, who is just -- when they went to him, sitting

23  there with Ms. Speed and they're just talking.

24          So they don't have that much of a threat.  And what

03:45:22PM25  they had was just -- even if it was with the automatic weapon,

1    that was just a threat.  So what they have to do then is look

2    at what there was.  There was no attempt to carry that out.

3    There was no attempt to arm himself.  So they had that

4    statement.

03:45:38PM 5         And according to case law, what you have to do then

6    is look at everything else.  And if there's none of those

7    other things there, your next question is what do you have to

8    do?  You have to reduce his guideline range.

9         So his guideline range gets reduced to in his case

03:45:56PM 10   6 to 12 months, and then you have to sentence him to within 6

11   to 12 months.

12         **THE COURT:** Sentence him to 6 to 12 months?  That's

13   the guideline range.  I don't have to do that.

14         **MR. SMITH:** The guideline range, right, 6 to 12

03:46:08PM 15   months.

16         **THE COURT:** Mr. Brown?

17         **MR. BROWN:** Thank you, Your Honor.  The counsel for

18   the defendant is focused on the second part of the guideline,

19   but the guideline actually reads if the offense involved a

03:46:21PM 20   single instance evidencing little or no deliberation, decrease

21   by four levels.

22         What the defendant can't overcome is the fact we

23   don't have a single instance.  What we have is the defendant

24   calling, threatening the AUSA; 50 minutes later calling back

03:46:36PM 25   threatening the AUSA again; the United States Marshals going

1  to pick him up and arresting him four hours later, he doubles

2  down on that threat.

3          It is not a single instance.  The reduction does

4  not apply.  Deliberation doesn't even need to be factored into

03:46:50PM 5  it because the matter, quite simply, is not a single instance.

6          **THE COURT:** Why is it not a single incident?

7          **MR. BROWN:** The calls are 50 minutes apart.  And

8  when they go to visit him to arrest him on it four hours

9  later, he doesn't say no, I didn't mean it; he doubles down

03:47:06PM 10  and says I'm gonna get you and I'm gonna get them.

11          It's not some single spontaneous utterance out of

12  frustration.  He makes one; he calls back, he makes a second

13  one; four hours later he makes -- he says, yeah, that's what I

14  said, and if I had a gun I'd do that, I'd do Orlando.

03:47:24PM 15          **THE COURT:** It's stronger -- he doesn't say if I had

16  a gun.  He says I do not have access to a gun.

17          **MR. BROWN:** Right.  But if I did, do that shit I

18  would is what he says, yes.

19          **THE COURT:** That was where?

03:47:34PM 20          **MR. BROWN:** That's when the marshals were arresting

21  him four hours later.

22          **THE COURT:** Where?

23          **MR. BROWN:** At his girlfriend's house, Cheektowaga.

24          **THE COURT:** Which is how far from here?  60 miles?

03:47:46PM 25  70 miles?

1           **MR. SMITH:** 60, 70 miles.

2           **THE COURT:** Okay.

3           **MR. SMITH:** I don't want that -- it should not be

4   all there is is how far away it is because it's within the

03:47:58PM 5   district.

6           But if I could talk a little bit about what he

7   said, he said, you know, if I had a gun.  If you could

8   remember, and I'm sure -- maybe I'm the oldest one here, so I

9   can remember from law school the first day of torts they had

03:48:11PM 10   this question of this guy that's saying, you know, if it was

11   not Assize Day, I'd run you through the sword.

12           And everybody said what is that?  And everybody

13   thought that was probably some kind of an assault.  But if you

14   listen, if it was not Assize Day, which was a special day

03:48:29PM 15   there in England.

16           So when he says if I had a gun, he doesn't have a

17   gun.  And it's clear he doesn't have a gun.  So really that to

18   me is nothing.  If I had a gun does not mean I'm going to get

19   a gun.  It's just if I had a gun.

03:48:44PM 20           But he does not have a gun.  And that threat is not

21   made to the U.S. Attorney; it's made to the marshals.  So you

22   got these two threats then.

23           And the two threats that we're talking about are

24   the first threat and the second threat 50 minutes apart.  And

03:49:01PM 25   the Court says 50 minutes apart -- doesn't really say 50

1  minutes, but two threats like that at the same time count as

2  one threat.  And then if you have the one threat, you got

3  the -- it's right in the *Wright vs. Darrisaw* (sic).

4          THE COURT: If you get past the single instance, can

03:49:22PM 5  you talk about deliberation?

6          MR. BROWN: I think the case law indicates that when

7  they're talking about the single instance and these kind of

8  spontaneous utterances, you're talking about giving somebody a

9  break who flies off the handle on one occasion without

03:49:39PM 10  thinking about it.

11          This guy flew off the handle for sure, made the

12  threats, and then called back almost an hour later and

13  repeated those threats.

14          This isn't one time where he got into a

03:49:53PM 15  miscommunication with the AUSA and then flew off the handle

16  once, which is exactly what this guideline is designed to

17  address.

18          In fact, the two instant cases I cited, *United

19  States vs. Edgin*, two phone calls is enough.  And they're not

03:50:05PM 20  a minute apart, they're 50 minutes apart.

21          And, again, he doubles down on that threat when the

22  marshals pick him up.  It's not a single instance, he is

23  obviously deliberating on it  because he calls back 50 minutes

24  later and makes the same threat, then four hours later makes

03:50:20PM 25  it again.

1          I don't think special circumstances apply where

2    it's a single instance --

3          **MR. SMITH:** I would --

4          **THE COURT:** You want to talk about deliberation?

03:50:33PM 5     **MR. BROWN:** With respect to deliberation, I think

6    the guidelines are crafted and the case law seems to indicate

7    this particular break is given to an individual who one time

8    flies off the handle and in the heat of the moment says

9    something.

03:50:46PM 10         You got somebody who calls back later, has clearly

11   had the time to process what the AUSA has already told him,

12   calls back, engages again and threatens again.  Then four

13   hours later again.

14         I think there's plenty of deliberation there.  This

03:51:02PM 15  isn't one continuous course of conduct.

16         **MR. SMITH:** If I could just be heard on the

17   deliberation, Your Honor?  I really think the two phone calls,

18   the case that was cited by the U.S. Attorney is from 1997,

19   it's a Tenth Circuit case, it's well after -- I mean, I don't

03:51:20PM 20  even know that they have to do anything.

21         The *Wright Darrisaw* case is after some more recent

22   cases and it is the circuit's attempt to look at this.  And

23   they have said two instances when they're this close together,

24   they understood people can fly off the handle and then still

03:51:39PM 25  be flying off the handle 50 minutes later.

1          THE COURT: Anything further on this issue?

2          MR. BROWN: No, Your Honor.  I think it's designed

3  specifically for the one instance and lack of deliberation.

4  And the fact that he repeats the threat three times over the

03:51:54PM 5  course of four or five hours is not warranting a four level

6  departure.

7          THE COURT: Okay.  But the facts of this case make

8  it clear he made two phone calls -- I'm not sure what time of

9  day.  It was noon-ish?

03:52:07PM 10          MR. BROWN: Around 1 o'clock and then around 1:50.

11          THE COURT: Then he's arrested in Cheektowaga some

12  60 miles away --

13          MR. BROWN: Four hours later.

14          THE COURT: He's going the opposite direction from

03:52:17PM 15  where he directed the threat, correct?  There's no weapon

16  found at the time he was arrested?

17          MR. BROWN: That's correct.

18          THE COURT: He indicated he didn't have access to

19  any such weapon, correct?

03:52:26PM 20          MR. BROWN: That's what he indicated.  We don't know

21  if that's true or not.

22          THE COURT: Okay.  Based upon that --

23          MR. SMITH: Wait, wait, wait.  You don't know if

24  it's true --

03:52:34PM 25          MR. BROWN: I don't know if he has access to a

1 weapon.

2        **MR. SMITH:** There's no weapons found in the house.

3        **MR. BROWN:** Correct, yes.

4        **MR. SMITH:** All right.

03:52:39PM 5        **THE COURT:** There's no indication he had access to

6 such a weapon, correct?

7        **MR. BROWN:** Right.

8        **THE COURT:** The Court finds that the guideline

9 2A6.1(b)(6) does apply in this case.  That the defendant's

03:52:51PM 10 entitled to a four level reduction to the guideline based upon

11 the fact that I do see this as a single instance, even though

12 the calls were some 50 minutes apart; and there was little or

13 no deliberation in this case.

14        In fact, the defendant went the opposite direction,

03:53:09PM 15 went 60 miles from this courthouse.  I'm not saying this

16 wasn't a serious matter, we'll get into that a little later,

17 but I don't believe there was any planning on his part.  It

18 appears that the phone call escalated.  The second phone call

19 escalated as well.

03:53:25PM 20        I think that the AUSA who wrote in a victim letter

21 indicated it actually started out in a calm manner; and the

22 second phone call -- and only then escalated to the threats in

23 the second phone call some 50 minutes later.

24        Clearly the defendant did not make any efforts to

03:53:41PM 25 carry out this threat to come to the federal courthouse with

1  an automatic weapon.  And when found four hours later, stated

2  to the United States Marshals that he did not have access to

3  such a weapon, and as stated, he was going the opposite

4  direction from this particular courthouse.

03:54:01PM 5          Therefore, the Court will apply the four level

6  downward adjustment to the sentencing guidelines.

7          The base offense level in this case is a level 12.

8          There is a three level increase for the victim

9  being an official.

03:54:27PM 10          A two level downward adjustment for acceptance of

11 responsibility, resulting in a total offense level of 13.

12         Then when the Court applies the four level downward

13 adjustment pursuant to 2A6.1(b)(6), results in a total offense

14 level of 9.

03:54:49PM 15          Do you have any other objections to the presentence

16 report?

17         **MR. SMITH:** No, Your Honor.

18         **THE COURT:** That really wasn't an objection to the

19 presentence report, but rather an articulation of what your

03:54:58PM 20 position was.

21         **MR. SMITH:** Right, the Court granted my motion.  I

22 have nothing else to say.

23         **THE COURT:** Do you have any objections to the

24 presentence report?

03:55:04PM 25          **MR. BROWN:** No, Your Honor.

1          **THE COURT:** Do you want to be heard?

2          **MR. BROWN:** Yes, Your Honor.  Your Honor, the nature

3  of this crime cannot be minimized.  The defendant is not

4  someone who merely spouts off at times and then isn't a man

03:55:17PM 5  who is willing to take out his anger and frustrations on

6  actual victims.

7          This is an individual with 35 years of criminal

8  history.  This is an individual who has shot other

9  individuals.  This is an individual who has stabbed other

03:55:30PM 10 individuals in the back.  This is an individual who has cut

11 two men's throats.  This is an individual who when he is angry

12 and he makes threats, they're threats that need to be taken

13 very, very seriously.

14         In this case they were taken seriously by the

03:55:42PM 15 victims and others in this building.  He committed an act with

16 absolutely no remorse thereafter.

17         Four hours later when he was confronted with the

18 marshals about his activity, he doubled down on it saying yes,

19 absolutely, I would do that.  If I had access to a gun, I

03:55:57PM 20 would do it.

21         It's a serious case, it deserves a serious penalty

22 and that's why the Government advocates for a top of the

23 guideline sentence followed by three years of supervised

24 release and the special assessment of $100.

03:56:08PM 25         **THE COURT:** Thank you, Mr. Brown.

1          **MR. BROWN:** Thank you.

2          **THE COURT:** Mr. Smith?

3          **MR. SMITH:** Thank you, Your Honor.  I'd like to say

4   that Mr. Ivey has known in his life -- he's 53 years old.  He

03:56:20PM 5   has known sadness.  His daughter was murdered in Atlanta in

6   2005 -- I'm sorry, the PSI is wrong.  His son was murdered.  I

7   thought that's what he told me, but I thought the PSI was

8   right.  His son was murdered in 2005.

9          It's been about ten years since he's been in

03:56:42PM 10  trouble.  He was in trouble maybe 2006.  Now he's 2016 when he

11  did this.

12         I would ask the Court to sentence him to time

13  served.  That's eight months and 22 days.

14         I would ask the Court that all the things that you

03:57:00PM 15  have on the upward departure, the 4A1.3, he does not appear to

16  apply for any of it.  So I would ask the Court not to grant an

17  upward departure.

18         I can't see that any of the things in there apply

19  to him.  So I would think that should be a guideline sentence,

03:57:19PM 20  and I would think the guidelines should be within 6 to 12

21  years -- 6 to 12 months.

22         **THE COURT:** Thank you, Mr. Smith.

23         Mr. Ivey, would you like to be heard?

24         **THE DEFENDANT:** Yes .

03:57:32PM 25         **THE COURT:** Please speak into the microphone.

1        **THE DEFENDANT:** I would like to apologize to the

2   assistant attorney, who I never did know his name because he

3   never did say his name.

4        So, therefore, some of what he wrote is -- I think

03:57:56PM 5   there's a guidelines about how far a person can go back in the

6   person's criminal history.

7        Some of what was said even here in this courtroom

8   is wrong.  When I got a violation in '89, the police who

9   arrested me came to testify at the parole hearing and --

03:58:27PM10   because I was reinstated.

11        When I got violated in '90, I was reinstated.

12        So, therefore, I haven't had -- I haven't had no

13   escapes.  It's called something else when you're -- absconding

14   charges on my history or nothing.

03:58:52PM15        And for me to have blown up like this, it's because

16   I was provoked, but the tape doesn't show that part.  And I

17   never did know the guy's name.  So it wasn't like I was

18   intending to do it.

19        I was just upset because he was saying he couldn't

03:59:14PM20   help me and I was calling who I thought could help me with

21   this problem that I had.

22        **THE COURT:** Okay.  When you say you were "provoked,"

23   because you weren't getting the answers that you wanted?

24        **THE DEFENDANT:** Right.

03:59:26PM25        **THE COURT:** He didn't say anything to provoke you?

1              THE DEFENDANT: Yeah.

2              THE COURT: What, please?

3              THE DEFENDANT: He said that's what's wrong with you

4    people, you just don't never want to listen.  And that's what

03:59:35PM 5    set me off.

6              THE COURT: When you called back a second time?

7              THE DEFENDANT: I didn't talk to him.  The call was

8    directed to a U.S. Marshal or -- or a New York State captain

9    because that's where he had sent the first call to.

03:59:56PM 10              THE COURT: Who provoked you on that call?

11              THE DEFENDANT: I wasn't provoked on that call

12    because I was talking to the captain, who I thought was the

13    New York State captain, and the guy said that can he get back

14    to me tomorrow.

04:00:11PM 15              That it wasn't never no person or not because that

16    is -- if you look at their phone records you'll see, and I

17    don't think it was no 50 minutes apart.

18              THE COURT: You don't think it was 50 minutes apart?

19              THE DEFENDANT: No, because you guys got my cell

04:00:31PM 20    phone.

21              THE COURT: Okay.  Anything else?

22              THE DEFENDANT: No, sir.  I just like to apologize

23    and I'm sorry and it will never happen again, I can guarantee

24    you that.

04:00:49PM 25              THE COURT: How can you guarantee me that?

16

1          **THE DEFENDANT:** Because it's not worth losing

2    control and being shoved to the feds for just running off at

3    the mouth.

4          **THE COURT:** Okay.

04:01:05PM 5          **THE DEFENDANT:** I been out for 14 years without no

6    problems, you know, that means I was trying to stay free and

7    didn't want to be locked up when my 94 year old mother died.

8          **MR. SMITH:** His mother has not died.  He wants to be

9    out and be free when his mother does.  I mean, everybody dies

04:01:30PM 10   sometime.  He's afraid that he will not be able to be free if

11   -- obviously, if the Court sentences him and he's locked up.

12          **THE COURT:** Okay.  Thank you.  Anything else you

13   want to say, Mr. Ivey?

14          **THE DEFENDANT:** Huh?

04:01:42PM 15          **THE COURT:** Do you want to say anything else?

16          **THE DEFENDANT:** Sure.  That, yes, that my brother

17   and my sister die within a month of each other.  One died --

18   my brother died at the last of November; my sister died at the

19   last of December.  So I wasn't able to attend their funeral,

04:02:10PM 20   but, you know, bad situation my being locked up and not being

21   able to attend, you know.

22          **THE COURT:** Okay.  Anything else?

23          **THE DEFENDANT:** Just apologize and I'm very sorry.

24          **THE COURT:** Thank you.

04:02:27PM 25          **MR. BROWN:** Your Honor, could I be heard briefly on

1   what he said?

2           **THE COURT:** Sure.

3           **MR. BROWN:** I've reviewed the calls, I've actually

4   listened to them, I've listened to the second call in its

04:02:35PM 5   entirety and I listened to the first call which was recorded

6   toward the end of that call.

7           And I can tell you without question that the AUSA

8   acted completely professionally and tried to refer the

9   defendant to an agency that could help him.

04:02:47PM 10   He did not provoke him in any way, say anything

11   derogatory toward him.  In fact, he was incredibly helpful and

12   was trying to get him to the agency that he was supposed to be

13   dealing with so he could get the help he asked for.

14          So the statement by the defendant that somehow the

04:03:00PM 15   victim provoked this outburst is, quite frankly, patently

16   absurd and is not supported at all by the evidence.  Thank

17   you.

18          **THE COURT:** Mr. Smith, I assume you've had a chance

19   to listen to those tapes?

04:03:12PM 20          **MR. SMITH:** Yes.

21          **THE COURT:** Mr. Ivey, obviously this is a very

22   serious matter, taken very seriously, particularly in today's

23   climate.  Throughout this country we're seeing all types of

24   incidents that give us grave concern about the safety of

04:03:30PM 25   individuals in the public and particularly in these types of

1  buildings.

2           And subsequent to your calls, this place was locked

3  down like Fort Knox.  The marshals and the court security

4  officers took the precautions that needed to be taken because

04:03:45PM 5  obviously nobody knew what the true intent was here.

6  Obviously, the threats were very, very frightening to a number

7  of individuals.  So you caused grave concern on that

8  particular day through your actions.

9           I have not listened to the entire tapes, but I take

04:04:07PM 10  the U.S. Attorney's Office for granted.  I know the individual

11  in this case, the Assistant United States Attorney involved in

12  this, and I can't believe for a minute that he would do

13  anything to provoke you.

14           I think as he said in his statement, what he was

04:04:21PM 15  trying to do is direct you in the right manner to the agency

16  that could help you.  His office could not help you that

17  particular day and you just weren't going to take no for an

18  answer.  You got more agitated and angry in this case.

19           It doesn't at all excuse it.  Might explain it, but

04:04:42PM 20  it doesn't excuse your conduct.

21           In this case the defendant, Tony Ivey, was

22  convicted of threatening to kill a federal prosecutor.

23           He's 53 years of age.  Has some college education.

24  Is a United States citizen.

04:04:57PM 25           There was some issues regarding his competency, but

1  he was examined fully in August of 2016 and found to be fully

2  competent.

3          This involved an incident on June 14th, 2016, where

4  the defendant did place threatening phone calls to an

04:05:15PM 5  Assistant United States Attorney here in the United States

6  Attorney's Office for the Western District of New York

7  complaining about the Rochester Housing Authority.

8          He was referred to that agency, was not satisfied,

9  became more agitated, indicated that he was going to come to

04:05:35PM 10  the United States Attorney's Office with an assault rifle and

11  shoot people.

12          Stating further that he was willing to die.  Called

13  the prosecutor a racist motherfucker, what's a motherfucker

14  got to do to get a Goddamn assault rifle.

04:06:03PM 15          Indicated he was full of shit.  Different

16  statements that obviously were very offensive.

17          The defendant was arrested after this was reported

18  to the Marshal's Service, arrested in Cheektowaga, New York,

19  some four hours later on that same day after being tracked

04:06:23PM 20  down by the United States Marshal.

21          When confronted by the marshal at the time of his

22  arrest, he indicated, I wish I had a gun, I just don't have

23  access.  But I would if I got -- if I got them, do that shit,

24  I would.

04:06:43PM 25          As the Court indicated, I do feel that a four level

1   reduction in 2A6.1(b)(6) is appropriate in that the

2   defendant's calls seemed to be the result of his agitated

3   state.

4            There's no evidence that he deliberated in his --

04:07:02PM 5         **MR. SMITH:** Your Honor --

6            **THE COURT:** -- statements or conduct.  Water?

7            **MR. SMITH:** Yeah.

8            **THE DEFENDANT:** Thank you.  Excuse me.

9            **THE COURT:** You okay?

04:07:34PM 10        **THE DEFENDANT:** Yes, sir.

11           **THE COURT:** Okay.  Based upon that the Court did

12   feel that the four level reduction under 2A6.1(b)(6) is

13   appropriate.

14           The base offense level in this case is a level 12.

04:07:56PM 15        There's a three level increase for the victim being

16   an official.

17           As I indicated, a four level downward adjustment

18   under 2A6.1(b)(6) for there being little deliberation, no

19   planning in this case, no indication that he attempted in any

04:08:16PM 20  way to carry out his threats.

21           A further two level reduction for acceptance of

22   responsibility, resulting in a total offense level of 9.

23           The defendant's criminal history category is listed

24   as a level II.  His history is extensive, beginning back in

04:08:36PM 25  1980 with a disorderly conduct.

1          1983 conviction for assault in the third degree

2 which involved the cutting of two individuals with a razor to

3 their throats.  He was placed on probation at some point and

4 probation was revoked.

04:08:54PM 5          Convicted in 1983 with a felony assault, received a

6 two to six year sentence.  That did involve a shooting of an

7 individual in the stomach.

8          Violation of disorderly conduct in '91.

9          Attempted criminal mischief in '91.

04:09:10PM 10          Attempted criminal possession controlled substance

11 seventh 1992.

12          Harassment in '92.

13          Resisting arrest in '92.

14          A criminal mischief charge in 1992 that did involve

04:09:24PM 15 an incident involving his swinging toward two police officers.

16          1993 harassment.

17          1994, 1998 aggravated unlicensed operation motor

18 vehicle charges.

19          1999 criminal possession marijuana fifth degree.

04:09:44PM 20 Also disorderly conduct.

21          Aggravated unlicensed operation motor vehicle in

22 2000, along with disorderly conduct, harassment.

23          2001 disorderly conduct charge.

24          2002 criminal mischief charge involved smashing

04:10:02PM 25 windows in a vehicle.

1        2003 assault in the second degree felony conviction

2   where he was sentenced to four years to the New York State

3   Department of Corrections, and parole was ultimately revoked.

4   That involved a stabbing of an individual in the back.

04:10:26PM 5        During the presentence report the defendant did

6   admit he had gambling issues and did admit running somebody

7   over with a vehicle based upon a gambling dispute.

8        He was born in Georgia in 1963.  Has some 17

9   siblings.  Is divorced; was married in 2000, divorced in 2004.

04:10:49PM 10        Has some health issues, including lupus, hip

11   replacement is needed, has some history of mental health

12   problems, including history of self-harm.

13        Consumed alcohol since the age of 7; marijuana

14   since the age of 17; cocaine since the age of 24.

04:11:09PM 15        Did attend Franklin High School until the 8th

16   grade; did secure a GED in 1993.  Did attend Monroe Community

17   College.

18        Has been unemployed since 2002.  Has previously

19   worked as a warehouse worker.

04:11:28PM 20        With a total offense level of 9, a criminal history

21   category of II, the guidelines range for sentencing would

22   involve a period of imprisonment between 6 and 12 months.  The

23   maximum sentence in this case is 10 years.

24        The defendant's been in custody since June of 2016,

04:11:49PM 25   since the time of the arrest, so he has some eight and a half

1    months in custody.

2         Mr. Ivey, the Court has to consider a number of

3    factors in determining the appropriate sentence in this case,

4    including the nature and circumstances of the offense.  As I

04:12:04PM 5    stated, this was a very serious crime.  Threatening to bring

6    an assault weapon to a federal courthouse or school or

7    anywhere is something that today, obviously, is extremely

8    frightening and a situation we see too often actually carried

9    out as opposed to simply threaten.

04:12:26PM 10         So it's an incident that we cannot condone and we

11   have to send a message strongly out there that it will not be

12   condoned.

13         The Court has to consider the history and character

14   of the defendant.  In this case, as I just outlined, you have

04:12:39PM 15   an extremely long criminal history.  Even though some involved

16   violations, a number of instances I indicated involved violent

17   incidents -- stabbing individuals, shooting individuals,

18   causing harm to individuals by way of razors or knives or even

19   a gun or a car.

04:13:00PM 20         You have a history of both domestic violence and

21   violence in the community to the point -- to the degree that

22   the Court finds that your criminal history category here,

23   level II, does not at all capture your real history of who

24   Tony Ivey is and his pattern of criminal violent activity over

04:13:28PM 25   decades.

1        Consequently, under 4A1.3 the Court finds that the

2  criminal history category of II does not in any way capture

3  the defendant's history and underrepresents the seriousness of

4  his criminal history category.

04:13:44PM 5        I believe he has some 20 convictions throughout his

6  history, and the Court has to consider that in determining the

7  appropriate sentence in this case.

8        The sentence must promote respect for the law and

9  must also provide just punishment and deter you and others

04:14:03PM 10 from engaging in this conduct.

11       I know you say you're sorry about what happened

12 here, that you were angry, but your history shows that in the

13 past you've carried out violent acts against individuals, and

14 the Court's obviously extremely concerned about that.

04:14:21PM 15       Based upon all that, the Court finds that an upward

16 departure is in order in this case.  That the guideline range

17 of 6 to 12 months under criminal history category II is

18 inappropriate in this case, it would not capture the real

19 essence of both nature of the charge and the defendant's

04:14:45PM 20 criminal history and background.

21       Therefore, the Court is going to upward depart and

22 sentence the defendant Tony Ivey to a period of imprisonment

23 for a period of 20 months.

24       The cost of incarceration will be waived.

04:15:03PM 25       The Court is also going to impose a period of

1   supervised release for a period of three years.  Or is it two

2   years is the maximum?  No, three years.  I'm going to impose a

3   period of three years supervised release with a number of

4   conditions.

04:15:18PM  5        One, that you not commit any violations of federal,

6   state or local laws.

7        That you not possess any firearms or dangerous

8   devices.

9        That you not possess any illegal controlled

04:15:28PM 10  substances.

11       That you submit to drug testing.

12       That you submit to a drug and alcohol evaluation

13  and follow any treatment recommendations.

14       That you submit a sample for DNA analysis.

04:15:40PM 15       That you submit for a mental health evaluation,

16  follow any treatment recommendations.

17       That you submit to a search of your person,

18  property, vehicle or residence upon reasonable suspicion.

19       The Court is not going to impose any fine.  I don't

04:15:57PM 20  see the defendant has any means to pay any fine.  Therefore,

21  no fine is imposed.

22       I will impose a $100 special assessment in this

23  case.

24       I believe this was a Pimentel plea, right?  So

04:16:14PM 25  there's no plea agreement --

26

1        **MR. SMITH:** That's correct, Your Honor.

2        **THE COURT:** -- in this particular case?

3        Is there any underlying accusatory that needs to be

4    dismissed in this case?

04:16:21PM 5        **MR. BROWN:** No, Your Honor.

6        **THE COURT:** This was on the indictment?

7        **MR. BROWN:** On the indictment, yes.

8        **THE COURT:** Anything further from Probation?

9        **MR. SPOGEN:** No, Your Honor.

04:16:28PM 10        **THE COURT:** Anything further from the Government?

11        **MR. BROWN:** No, Your Honor.  Thank you.

12        **THE COURT:** Mr. Smith?

13        **MR. SMITH:** Yes, Your Honor.  I'd ask that Mr. Ivey

14    be sentenced as close to Rochester as the Court can.

04:16:44PM 15        **THE COURT:** Okay.  I do believe he has some family

16    members present in court.  I think it's important for the

17    defendant to have family available while he's in prison and

18    upon his release so he can be acclimated back to the

19    community.  Therefore, I will request that he be sentenced to

04:17:01PM 20    a facility as close to Rochester as possible.

21        Mr. Ivey, I think the most important part of this

22    sentence is that you pursue mental health counseling.

23    Obviously, I think there's a history here that obviously

24    underlies what happened in this particular case.  You have to

04:17:17PM 25    be able to deal with your emotions properly, not be uttering

1    threats toward individuals or acting out towards individuals.

2    So it's important you follow through with that recommendation.

3            Do you understand that?

4            **THE DEFENDANT:** Yes, sir.

04:17:28PM 5    **THE COURT:** Okay.  Thank you.  Anything further?

6            **MR. SMITH:** No.

7            **MR. BROWN:** No, Your Honor.

8            **THE COURT:** I will notify you, Mr. Ivey, of your

9    right to appeal in this case.  Since again there was no plea

04:17:42PM 10    agreement, you can discuss with Mr. Smith if there's any

11    issues for appeal in this particular case.  Thank you.

12            (**WHEREUPON**, the proceedings adjourned at 4:17 p.m.)

13                    *   *   *

14                **CERTIFICATE OF REPORTER**

15

16            In accordance with 28, U.S.C., 753(b), I certify that

17    these original notes are a true and correct record of

18    proceedings in the United States District Court for the

19    Western District of New York before the Honorable Frank P.

20    Geraci, Jr. on March 7th, 2017.

21

22    S/ Christi A. Macri

23    Christi A. Macri, FAPR-CRR
      Official Court Reporter

24

25